FILED _____      _____ RECEIVED
ENTERED _____      _____ SERVED ON
COUNSEL/PARTIES OF RECORD

MAY - 6 2010

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____ DEPUTY

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

USACM LIQUIDATING TRUST,                  )
                                          )
            Plaintiff,                    )
                                          )          2:09-cv-01947-RCJ-PAL
      vs.                                 )
                                          )
ANTHONY MONACO et al.,                    )                **ORDER**
                                          )
            Defendants.                   )
_____)

      This 28 U.S.C. § 1334 adversary proceeding arises out of the alleged unlawful use of and

failure to repay funds of bankrupt USA Commercial Mortgage Co. ("USACM") by two former

USACM insiders, Thomas A. Hantges and Joseph D. Milanowski (collectively, the "Culpable

Insiders"), in conjunction with Defendants Anthony Monaco, Susan Monaco, and Monaco

Diversified Corp., in order to finance profitable real estate developments.

      Plaintiff USACM Liquidating Trust (the "Trust") alleges the Culpable Insiders directed

the transfer of $5 million of USACM's funds in order to capitalize real estate development

ventures between themselves and Defendants. The unlawful advances made these

developments possible, Defendants received over $23 million from the developments, and

USACM was never repaid. All causes of action have been dismissed except the fourth cause of

action for unjust enrichment. Defendants argue that the Trust's unjust enrichment claim is

barred by: (1) the existence of an express contract; (2) lack of standing; and (3) the defense of *in

pari delicto*. Defendants previously raised each of these arguments in a motion to dismiss,

which was denied by the Bankruptcy Court. On January 27, 2010, the Court denied Defendants'

Motion for Summary Judgment (#4) and granted in part Plaintiff's Motion to Impose Sanctions

for Discovery Abuses and to Compel Discovery (#15). (*See* #55). The Court denied a default

judgment but granted monetary sanctions in the total amount of $50,000: (1) $25,000 against

Anthony Monaco, Susan Monaco, and the community thereof, jointly and severally; and (2)

$12,500 each against Winthrop Couchot Professional Corporation ("Winthrop Couchot") and

Santoro, Driggs, Walch, Kearney, Holley & Thompson ("Santoro"). Each of these Defendants

has now moved for reconsideration of the order for sanctions pursuant to Rules 54, 59, and 60.

(*See* #59, #62, #66). For the reasons given herein, the Court denies the Monacos' and Winthrop

Couchot's Motions for Reconsideration (#59, #62) and grants Santoro's Motion for

Reconsideration (#66).

## I.      BACKGROUND

### A.      USACM and USAIP

USACM was a licensed mortgage broker that originated and serviced multi-beneficiary

loans secured by real property. (#18 ¶ 9). Throughout the relevant time period, USACM was

owned by Hantges, Milanowski, The Jamie Linn Hantges Separate Property Trust UAD 6/12/97

("Jamie Wise Trust"), Red Granite, LLC ("Red Granite"), and Paul S. Hamilton. (#19 ¶¶ 2–4;

#20-4 at 157). In addition to Hantges, Milanowski, and Victoria Loob, USACM also had other

officers, including a chief financial officer, Robert A. Hilson. (#21, Ex. H, at 11:24–14:4). In

addition, Eugene Buckley, served as an outside director from early 2001 until resigning in

September 2003. (*Id.*, Ex. I, at 48:1–3 and 66:7–15). There is no evidence in the record to

suggest that the Jamie Wise Trust, Red Granite, Hilson, Buckley, and/or Hamilton were aware

of or participated in the Culpable Insiders' misconduct.

Hantges and Milanowski created USA Investment Partners, LLC ("USAIP") as a

1    holding company for land acquisition and/or real estate development entities. (#18 ¶ 11).

2    USAIP obtained many of these interests without making any cash contributions—or at most

3    nominal contributions—in exchange. (*Id.* ¶ 12).  Rather, the investments held by USAIP were

4    principally obtained as a result of the Culpable Insiders' misconduct in diverting millions of

5    dollars from USACM to USAIP for their own gain. (*Id.* ¶ 12–13).  USACM never held any

6    ownership interest in USAIP. (*Id.* ¶ 11).

7         **B.    The Eagle Ranch Project**

8         Eagle Ranch, LLC was a real estate holding company owned by several investors that

9    held several hundred lots in Victorville, California. (*Id.* ¶¶ 14–15).  Eagle Ranch, LLC's

10   manager throughout the relevant time period was USA Commercial Real Estate Group, which

11   was owned and managed by the Culpable Insiders. (*Id.* ¶ 15).  The lots owned by Eagle Ranch,

12   LLC were part of a pre-existing "Eagle Ranch" development that had previously been owned

13   and partially developed by Inco Homes Corp. ("Inco"). (*Id.* ¶ 14; #21, Ex. A, at 50:10–18).

14   Anthony and Susan Monaco each had exposure to the Eagle Ranch development during their

15   tenure at Inco in the mid to late 1990's as superintendent and vice president of marketing,

16   respectively. (#21, Ex. A, at 49:16–50:18, 51:2–15; *id.*, Ex. C, at 36:18–37:16, 38:22–39:18).

17   Thus, the Culpable Insiders retained Anthony and Susan Monaco as paid consultants to assist in

18   pre-development of the lots owned by Eagle Ranch, LLC. (#21, Ex. A, at 53:25–56:3; *id.*, Ex. C,

19   at 51:14–52:5).  In August 2000, the Culpable Insiders and the Monacos formed Eagle Ranch

20   Residential, LLC ("ERR") in order to develop the lots owned by Eagle Ranch, LLC. (#6, Ex. 1).

21   When ERR was formed, the Monacos lacked the capital to fund the project, (#21, Ex. A, at

22   257:7–25, 105:2–108:15 ), and Eagle Ranch, LLC, being a holding company, had no income of

23   its own, (#18 ¶ 15).  As a result, the Culpable Insiders caused USACM to advance

24   $5,004,445.16 to Eagle Ranch, LLC, ERR, and/or third parties for the benefit of Eagle Ranch,

25                                      Page 3 of 15

1    LLC and ERR. (*Id.* ¶¶ 16, 18–19). The advances USACM made to fund the Eagle Ranch

2    project were capital contributions; had it not been for the advances, the development efforts of

3    the Eagle Ranch project never would have been possible. (#21, Ex. A, at 257:7–25,

4    105:2–108:15).

5            **C.     The Willowbrook Project and Other Projects**

6            Revenues of the Eagle Ranch project were not used to re-pay the advances made from

7    USACM's funds, but were instead diverted into other real estate projects. (*Id.*, Ex. A, at

8    257:7–25, 105:2–108:15). The first two of these projects ultimately were owned by

9    Willowbrook Residential, LLC ("Willowbrook"). The projects owned by Willowbrook were

10   entirely capitalized with sales revenues diverted from the development of the Eagle Ranch

11   project and with funds advanced from USACM. (*Id.*, Ex. A, at 258:5–19, 126:10–22, 142:8–18).

12   Had it not been for these advances, the development of the Willowbrook projects never would

13   have been possible. (*Id.*). As the development of the projects owned by Willowbrook

14   Residential, LLC began to generate revenue, these revenues were used, along with ERR

15   revenues and additional diversions of USACM assets, to capitalize other real estate projects.

16   (*Id.*, Ex. A, at 258:20–25, 260:3–18). Each of these projects—owned directly or indirectly by

17   Defendants and USAIP—functioned as a single, integrated company (collectively, the

18   "Tanamera Residential Group," or "TRG"). (*Id.*, Ex. A, at 262:3–263:1; #18 ¶¶ 21–22). Funds

19   were routinely

20   commingled between ERR, Willowbrook, and other TRG projects, as cash was circulated on an

21   "as-needed" basis. (#21, Ex. A, at 263:7–264:9).

22           **D.     Distributions to Defendants**

23           Although USACM provided the capital that made development of the Eagle Ranch

24   and TRG projects possible, USACM was never repaid for $3,024,445.16 of the advances that it

25                                              Page 4 of 15

1   made to the Eagle Ranch and TRG projects. (#18 ¶¶ 25–26).  In contrast, Anthony and Susan

2   Monaco—who never contributed a penny of their own funds—pocketed in excess of $23

3   million of the revenues generated by the development of the Eagle Ranch project and the

4   development and/or sale of TRG projects. (#21, Ex. A, at 278:7–12, 277:3–278:6,

5   132:13–134:18).  Both Anthony and Susan Monaco conceded during their depositions that

6   USACM should have been repaid before the distributions were made. (*Id.*, Ex. A, at 275:3–8;

7   *id.*, Ex. C., at 132:4–11).

8   **II.     LEGAL STANDARDS**

9        **A.     Rule 37**

10        Rule 37 of the Federal Rules of Civil Procedure permits a court to impose sanctions

11   against a party or the party's attorney for discovery violations.  Sanctions may imposed if a party

12   fails to comply with a discovery order, Fed. R. Civ. P. 37(b)(2)(A), or if a party "fails to provide

13   information or to identify a witness as required by Rule 26(a) or (c)," Fed. R. Civ. P. 37(c)(1).

14   In the latter case, the culpable party "is not allowed to use" the undisclosed information or

15   witness as evidence, unless the failure was substantially justified or harmless. Fed. R. Civ. P.

16   37(c)(1).  Additionally, a court has the discretion after a motion and hearing to: (1) order

17   payment of reasonable expenses, including attorney's fees, caused by the failure; (2) inform the

18   jury of the failure; and (3) impose other appropriate sanctions, including any of those listed in

19   Rule 37(b)(2)(A)(i)–(vi). Fed. R. Civ. P. 37(c)(1)(A)–(C).  The potential sanctions listed in Rule

20   37(b)(2)(A)(i)–(vi) include: (1) directing that the matters encompassed by the discovery failures

21   be taken as established; (2) prohibiting the culpable party from supporting or opposing relevant

22   claims or defenses; (3) striking pleadings; (4) staying proceedings until compliance; (5)

23   dismissing the action in whole or in part; or (6) rendering a default judgment against the

24   culpable party. Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi).

25                                        Page 5 of  15

1   The imposition of or refusal to impose discovery sanctions is reviewed for an abuse of

2   discretion. *See Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1010 (9th Cir. 2004). Findings

3   of fact underlying discovery sanctions are reviewed for clear error. *Payne v. Exxon Corp.*, 121

4   F.3d 503, 507 (9th Cir. 1997). If the district court fails to make factual findings, the decision

5   whether to impose sanctions is reviewed de novo. *Adriana Int'l Corp. v. Thoeren*, 913 F.2d

6   1406, 1408 (9th Cir. 1990).

7   **B.   Motions for Reconsideration**

8   A motion to alter or amend a judgment must be made within twenty-eight (28) days of

9   entry of judgment. Fed. R. Civ. P. 59(e). Here, judgment was entered on January 27, 2010, and

10   the present motions were filed on February 22, 2010, (*see* #59, #62), and February 24, 2010,

11   (*see* #66), which are twenty-six and twenty-eight days later, respectively. Therefore the motions

12   to reconsider are timely under Rule 59(e) and should be considered under that rule as opposed to

13   Rule 60(b). *Am. Ironworks & Erectors, Inc. v. N. Am. Contr. Corp.*, 248 F.3d 892, 898–99 (9th

14   Cir. 2001). Moreover, invocation of Rule 59(e) requires a final judgment or appealable

15   interlocutory order, *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989), and the

16   sanctions order was neither. An order denying a motion for contempt, for example, is not a

17   "judgment" for the purposes of Rule 59(e) because it does not "end[ ] the litigation on the merits

18   and leave[ ] nothing for the court to do but execute the judgment." *Id.* at 467 (quoting *Coopers*

19   *& Lybrand v. Livesay*, 437 U.S. 463, 467 (1978) (quoting *Catlin v. United States*, 324 U.S. 229,

20   233 (1945))). The Eighth Circuit has held that Rule 11 sanctions, at least, are not governed by

21   Rule 59(e). *Lupo v. R. Rowland & Co.*, 857 F.2d 482, 484–85 (8th Cir. 1988); *see also Ruehman*

22   *v. Village of Palos Park*, 842 F. Supp. 1043, 1060 (N.D. Ill. 1993).

23   However, a district court has inherent power to reconsider its interlocutory orders if it

24   finds just cause to do so, so long as it retains jurisdiction in the matter. *City of L.A., Harbor Div.*

1    *v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001).

2    **C.    Interlocutory Review**

3    There are two different vehicles to obtain interlocutory appeal: Federal Rule of Civil

4    Procedure 54(b) and 28 U.S.C. § 1292(b). Rule 54(b) permits a Court to enter judgment after

5    making a ruling partially disposing of a case, or to await its rulings on remaining causes of

6    action in the case before entering judgment, at its discretion:

7        When an action presents more than one claim for relief—whether as a claim,
        counterclaim, crossclaim, or third-party claim—or when multiple parties are
8        involved, the court may direct entry of a final judgment as to one or more, but fewer
        than all, claims or parties only if the court expressly determines that there is no just
9        reason for delay. Otherwise, any order or other decision, however designated, that
        adjudicates fewer than all the claims or the rights and liabilities of fewer than all the
10       parties does not end the action as to any of the claims or parties and may be revised
        at any time before the entry of a judgment adjudicating all the claims and all the
11       parties' rights and liabilities.

12   Fed. R. Civ. P. 54(b). Section 1292(b) allows for interlocutory review of non-dispositive rulings

13   in a case under a narrow set of circumstances:

14       When a district judge, in making in a civil action an order not otherwise
        appealable under this section, shall be of the opinion that such order involves a
15       controlling question of law as to which there is substantial ground for difference of
        opinion and that an immediate appeal from the order may materially advance the
16       ultimate termination of the litigation, he shall so state in writing in such order. The
        Court of Appeals which would have jurisdiction of an appeal of such action may
17       thereupon, in its discretion, permit an appeal to be taken from such order, if
        application is made to it within ten days after the entry of the order: Provided,
18       however, That application for an appeal hereunder shall not stay proceedings in the
        district court unless the district judge or the Court of Appeals or a judge thereof
19       shall so order.

20   28 U.S.C. § 1292(b). If a district court includes the required language in the order, this gives the

21   Court of Appeals jurisdiction to accept the interlocutory appeal at its discretion. Although the

22   jurisdictional statute does not use the terminology, inclusion of the jurisdictionally required

23   language by the district court is commonly referred to as "certification." The Ninth Circuit has

24   carefully explained the difference between these two routes to interlocutory review:

25                               Page 7 of 15

Some of our cases use the phrase "Rule 54(b) certification." This is a misnomer born of confusion between Rule 54(b) and 28 U.S.C. § 1292(b), only the latter of which requires a certification. The two procedures apply to different situations. Rule 54(b) applies where the district court has entered a final judgment as to particular claims or parties, yet that judgment is not immediately appealable because other issues in the case remain unresolved. Pursuant to Rule 54(b), the district court may sever this partial judgment for immediate appeal whenever it determines that there is no just reason for delay. A court of appeals may, of course, review such judgments for compliance with the requirements of finality, but accords a great deference to the district court.

By contrast, section 1292(b) addresses the situation where a party wishes to appeal an interlocutory order, such as pertaining to discovery, denying summary judgment, denying a motion to remand, or decertifying a class. Normally, such interlocutory orders are not immediately appealable. In rare circumstances, the district court may approve an immediate appeal of such an order by certifying that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Even where the district court makes such a certification, the court of appeals nevertheless has discretion to reject the interlocutory appeal, and does so quite frequently.

Section 1292(b) is a departure from the normal rule that only final judgments are appealable, and therefore must be construed narrowly. This explains the reasons for the specific form of the certification required of the district court and de novo review thereof by the court of appeals. By contrast, a Rule 54(b) severance is consistent with the final judgment rule because the judgment being severed is a final one, whose appeal is authorized by 28 U.S.C. § 1291. Referring to a Rule 54(b) severance order as a "certification" misleadingly brings to mind the kind of rigorous judgment embodied in the section 1292(b) certification process. In reality, issuance of a Rule 54(b) order is a fairly routine act that is reversed only in the rarest instances.

*James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1068 n.6 (9th Cir. 2002) (citations omitted).

## III.   ANALYSIS

### A.   The Monacos and Winthrop Couchot

As Plaintiff notes, Defendants have taken a "grab bag" approach to the rules governing reconsideration and interlocutory appeal, rearguing the merits of the sanctions order without addressing the standards that govern the rules for challenging it. When the rules are examined, the Court's sanctions order cannot be challenged under any of the rules invoked: Rules 54, 59,

Page 8 of 15

1    or 60. First, the motions were timely under Rule 59(e), making consideration under Rule 60(b)

2    inappropriate. *Am. Ironworks & Erectors, Inc.*, 248 F.3d at 898–99. Second, the Court has not

3    entered a final judgment in this case as to any particular claims or parties, so Rule 54(b) does

4    not apply. Fed. R. Civ. P. 54(b). Third, reexamination on appeal of the Court's sanctions order

5    will not materially advance the litigation, so review under § 1292(b) is not appropriate.

6    Moreover, sanctions are not immediately appealable, so it is unlikely the Court of Appeals

7    would accept jurisdiction even if the Court "certified" the issue under either Rule 54(b) or §

8    1292(b). *See Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1054–55 (9th Cir. 2007)

9    (citing *Cunningham v. Hamilton County*, 527 U.S. 198, 204 (1999)); *Balla*, 869 F.2d at 467.

10   Finally, although timely, the Court will not address the present motions under Rule 59(e)

11   because the Court's order is not a "judgment" under the meaning of Rule 59(e). *Balla*, 869 F.2d

12   at 467. However, the Court has inherent power to reconsider the sanctions order because it is an

13   interlocutory order and the Court retains jurisdiction over the case. *City of L.A, Harbor Div.*,

14   254 F.3d at 885.

15        Defendants make several arguments in support of reconsideration: (1) the Trust did not

16   request the documents in the "fifty boxes" of documents in its first request for production and

17   never asked for access to them after discovered; (2) adverse inferences are unwarranted because

18   no spoilation of evidence occurred, there was no evidence indicating that the documents would

19   have produced unfavorable evidence, there is no evidence the Monacos had possession of

20   accounting records of the Development Entities, there is no correlation between the adverse

21   inferences granted and the documents alleged not to have been produced, there is no evidence

22   the sought after information was not readily available elsewhere, the relief granted violated the

23   Monacos procedural due process because the Monacos had no opportunity to present live

24   testimony; and (3) the monetary sanctions of $50,000 were not reasonable attorneys fees and

25                                      Page 9 of 15

1    costs.

2          First, Defendants failed to comply with the discovery rules in good faith.  The Trust

3    attempted for over a year to obtain the disputed materials that we now know Defendants

4    possessed but did not disclose despite repeated requests.  The Trust's attempts to obtain these

5    materials through both routine discovery and the circuitous depositions they were forced to take

6    due to Defendants' misdirections easily satisfies the substance of the "meet and confer"

7    requirement for a sanctions motion.  Michael J. Yoder's declaration in support of the original

8    motion for sanctions includes the request for production at issue (the "RFP").  (*See* #16, Ex. B).

9    In the RFP, the Trust sought "all requested Documents in Defendants' possession, custody, or

10   control." (#16-1 at 38).  Documents specifically requested included: (1) "Documents relating to

11   the financial affairs and/or condition of any of the following persons[: USACM, USAIP,

12   Milanowski, Hantges]"; (2) "Documents referring and relating to any transactions between

13   Defendants and any of [USACM, USAIP, Milanowski, Hantges]"; (3) "Documents referring

14   and relating to any transfer(s) of assets (monetary or otherwise) between Defendants and

15   USACM, USAIP, Milanowski, and/or Hantges"; (4) "All Communication between Defendants

16   and USACM, USAIP, Milanowski, and/or Hantges during the relevant period[, including]

17   Communications relating or referring to [their] officers, directors, employees, agents, servants,

18   consultants, representatives, predecessors, successors, subsidiaries, affiliates, divisions or other

19   related organizations"; (5) "Documents evidencing Defendants' Communications, solicitations,

20   marketing materials, or efforts to obtain monies or investments from USACM, USAIP,

21   Milanowski, and/or Hantges"; (6) "Documents, referring or relating to any business, financial,

22   employment or other relationship that has ever existed between Defendants and one or more of

23   the following parties: [USACM, USAIP, Milanowski, and Hantges]"; (7) "Documents

24   evidencing any assertions that Defendants have made or will make that USACM received

25                                          Page 10 of 15

reasonably equivalent value for the transfers"; (8) "Documents evidencing any of the Defendants' legal formation"; (9) "Documents evidencing the negotiation, execution, servicing or repayment of loans, promissory notes, or other debt instruments or obligations . . . involving USACM, USAIP, Milanowski, and/or Hantges"; (10) "Documents evidencing Communications . . . relating or referring to [such debt]; (11) "Documents evidencing any liability payable to Defendants by USACM, USAIP, Milanowski, and/or Hantges"; (12) "Documents evidencing Defendants' effort to collect any liability owed to Defendants by USACM, USAIP, Milanowski, and/or Hantges"; (13) "Documents relating or referring to any Communication Defendants have had with any Person regarding the financial condition of USACM, USAIP, Milanowski, and/or Hantges"; (14) "Documents relating to, referring to, supporting, or refuting any of the affirmative defenses asserted in response to the Debtors' complaint"; and (15) "Documents referring and relating to any membership contribution, distribution, or other transaction between Anthony Monaco and/or Susan Monaco and any other Defendant." (*Id.*, Ex, B).

In the Motion to Impose Sanctions for Discovery Abuses and to Compel Discovery (#15), the Trust complained that Defendants and their counsel had failed to produce "forty-five of the fifty boxes of relevant documents and two document servers that the Monacos identified in testimony . . . .", (#15 at ¶ 3), and that there was no response at all to RFP numbers 4, 5, 7, and 10–13, (*see id.* ¶ 10 & n.4). Defendants argued that the boxes contained nothing relevant and that they were not in the Monacos' custody and control because the boxes of documents were in the custody of Builder's Capital, to whom the Monacos had sold several Defendant entities for $1. The Court resolved these issues against Defendants, finding the sale of the Defendant entities to be sham sales and that Defendants retained custody of these boxes, in any case. Particularly illuminating was the testimony of David Fogg, the owner of Builder's Capital, who attested that he did not possess the documents that the Monacos claimed he did, but that so

far as he knew, Thomas Cooley, the Monacos' comptroller, had them.  Also, the explanation that the Monacos were having trouble accessing their servers was unsatisfactory.  Finally, Defendants apparently never moved for a protective order to prevent the discovery of these documents.

Initially, the Court refused to award sanctions because the Monacos had not been questioned under oath.  The Trustee then deposed them and obtained admissions from Anthony Monaco that he had access to the storage unit where at least fifty boxes of relevant documents were stored and that he didn't know if these documents were disclosed in response to the RFP. He also admitted that he could have obtained documents from Fogg or Cooley by simply asking for them.  He flatly admitted that his previous statements regarding his control over the Defendant entities were "not totally true."  The Court declines to reconsider monetary sanctions as against the Monacos or Winthrop Couchot.

Second, a Court may direct that matters encompassed by discovery failures shall be taken as established as a penalty for failing to comply with Rules 26(a) or 26(e). Fed. R. Civ. P. 37(c)(1), (c)(1)(C), and (b)(2)(A)(i).  Defendants argue that spoilation of evidence is required as a prerequisite to imposing such a sanction.  Although spoilation of evidence is sufficient to support an adverse inference instruction to a jury even without any discovery violation, *see Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991), Rule 37 does not require spoilation of evidence as a prerequisite for the "taken as established" sanction. *Akiona* involved no discovery violation, and the court there did not even mention the discovery rules. *See generally Akiona*, 938 F.2d 158.  The "adverse inference" rule is a common-law rule separate from the Federal Rules of Civil Procedure, which provide for independent discovery-related sanctions. *See generally* Fed. R. Civ. P. 37.  In summary, destruction of evidence is sufficient to implicate the common-law "adverse inference" instruction, but destruction of evidence is not necessary to

1    invoke the "taken as established" sanction under Rule 37.  The former is a common-law remedy,

2    whereas the latter is a black-letter textual sanction available to the Court under Rule 37.

3           Third, the award of fees and costs was reasonable.  Defendants argue that $50,000 is not

4    a reasonable award of attorneys fees and costs in this case under Rule 37(b), and that the Trust

5    did not attach a certification of consultation and sincere effort to resolve the matter as required

6    by Local Rule 26-7.  The Trust responds that its fees and expenses "related directly to dealing

7    with the Monaco Defendants' and their counsels' bad faith discovery practices" was $73,190.94.

8    The Trust attaches the affidavit of Andrea Levin Kim, special litigation counsel for the Trust, in

9    support. (*See* #71 ¶ 2).  Kim attests that the Trust expended at least $73,190.94 from November

10   2008 through January 19, 2010 "in dealing with issues related to the Monaco Defendants'

11   failure to disclosure [sic] and produce documents," including communications with the

12   Monacos' counsel regarding deficient production, research and briefing for two motions to

13   compel, and travel and preparation for the two hearings on those motions. (*Id.* ¶ 3).  A table is

14   attached listing the fees and costs for each day from February 9, 2009 to January 31, 2010, but

15   not further itemizing them. (*See id.*, Ex. A).  Exhibit B consists of billing invoices, with billing

16   information pertaining to other cases redacted. (*Id.*, Ex. B).  The relevant work is itemized. (*See,*

17   *e.g.*, #71 at 20 ("ADK   Work on discovery coordination and response/motion to compel issues;

18   revise correspondence to opposing counsel re same   2.70 hrs   1012.50")).  The rest of the items

19   listed in the table in Exhibit A appear to be itemized in Exhibit B, and they all appear to be

20   related to the discovery dispute.  The award of $50,000 was reasonable.

21          Finally, contrary to Defendants' arguments, the exhibits attached to Michael J. Yoder's

22   declaration in support of the original motion for sanctions satisfy Local Rule 26-7. (*See* #16,

23   Exs. A–Y).  Those exhibits recount the discovery dispute, and they include communications

24   from the Trust's counsel to Defendants' counsel attempting to resolve the dispute. (*See, e.g.*,

25                                          Page 13 of 15

#16, Ex. C). In Exhibit C, counsel for the Trust noted that it was agreeing to an extension of time for Defendants to reply to the RFP so that Winthrop Couchot would actually provide the documents by overnight delivery from December 1–2, 2008, and not simply to provide them more time to prepare objections. Winthrop Couchot responded that they would comply. Exhibit D is a February 25, 2009 letter from the Trust's counsel to Richard H. Golubow, the Monacos' counsel, complaining of deficiencies in the response to the RFP and threatening to file a motion to compel if the dispute was not satisfactorily addressed. Further email exchanges attached as exhibits indicate a history of Defendants' counsel requesting additional extensions to comply. Local Rule 26-7 was satisfied.

**B.     Santoro**

Santoro argues primarily that it did not believe the motion for sanctions was directed against it, because Santoro had no part in the discovery practice in this case, which is why it did not file a response to the motion for sanctions. Santoro attaches the affidavit of Richard F. Holley, Esq. in support. (*See* # 67). He attests that the Monacos retained Santoro as local counsel on or about June 30, 2008, (*id.* ¶ 7), and that Santoro's function as local counsel was limited to downloading pleadings to forward to chief counsel, electronically filing pleadings, and calculating deadlines, (*id.* ¶ 8). According to Holley, Santoro "never participated in any discovery" and "was unaware of any discovery disputes between the Trustee and Monaco Defendants" until the Trustee filed the motion for sanctions, which is why Santoro filed no objection to that motion—a motion which does not mention Santoro by name, but only Winthrop Couchot. (*Id.* ¶¶ 10–12, 15). Santoro's arguments are much better than those of the Monacos and Winthrop Couchot, because they are based on both a lack of notice and a lack of any involvement with the discovery practice in this case. Although Santoro technically had an opportunity to make these arguments in response to the original motion for sanctions, it was not

1    on reasonable notice that the motion for sanctions was directed against it, because it was not

2    named in the motion and had not been involved in the discovery practice in this case.  The Court

3    therefore reconsiders the sanctions order as to Santoro.

4                                              **CONCLUSION**

5              IT IS HEREBY ORDERED that the Monacos' and Winthrop Couchot's Motions for

6    Reconsideration (#59, #62) are DENIED.

7              IT IS FURTHER ORDERED that Santoro's Motion for Reconsideration (#66) is

8    GRANTED.

9              IT IS FURTHER ORDERED that the total award of $50,000 is reallocated as follows:

10   $25,000 against Anthony Monaco, Susan Monaco, and the community thereof, jointly and

11   severally; and $25,000 against Winthrop Couchot Professional Corporation.

12         DATED:  This 6th day of May, 2010.

13

14

15

16   ROBERT C. JONES
     United States District Judge

17

18

19

20

21

22

23

24

25                                    Page 15 of 15